# UNITED STATES DISTRICT COURT

# SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| OFF-ROAD BUSINESS ASS'N.;SAN DIEGO OFF-ROAD COAL.; CALIFORNIA OFF ROAD VEHICLE ASS'N.; AM. MOTORCYCLE ASS'N.; DESERT VIPERS; ET AL.,<br><br>          Plaintiffs,<br>v.<br><br>U.S. DEPT. OF INTERIOR; GALE NORTON; BUREAU OF LAND MGMT.; ET AL.,<br><br>          Defendants. | Civil No: 03 CV 1199-B(POR)<br><br>ORDER ON CROSS MOTIONS FOR SUMMARY JUDGMENT |

Plaintiffs Off-Road Business Association, San Diego Off-Road Coalition, California Off-Road Vehicle Association, American Motorcycle Association District 37 and Desert Vipers (collectively "Plaintiffs") and Defendants Bureau of Land Management ("BLM"), Gale Norton (in her official capacity as the Secretary of the Interior) and U.S. Department of the Interior (collectively, "Defendants") brought the instant cross-motions for summary judgment pertaining to the sufficiency of the Environment Impact Statement ("EIS") for the

Northern and Eastern Colorado Desert Resource Management Plan (the "NECO Plan"). For the reasons herein, the Court **DENIES** Plaintiffs' motion and **GRANTS** Defendants' motion.

**I.      FACTUAL BACKGROUND**

At issue here is a challenge to the sufficiency of an EIS that was prepared for a region within the California Desert Conservation Area, known as the Northern and Eastern Colorado Desert area. The California Desert Conservation Area is 25-million acres of land set aside in 1976 when Congress enacted the Federal Land Policy and Management Act. The management of the California Desert Conservation Area falls to the BLM, which at the direction of Congress completed a multi-use plan to cover this area in 1980 (the "CDCA Plan").

In particular, Plaintiffs challenge whether the EIS sufficiently addressed impacts on the spread of disease among the desert tortoise, a resident species in the California Desert Conservation Area. The desert tortoise (scientific name *Gopherus agassizii*) lives in the Mojave and Sonoran deserts in the Southwest United States. Its habitat consists of flats, bajadas (slopes at the base of rocky hills) and rocky terrain containing scattered shrubs and herbaceous plants. The population size of the desert tortoise has been decreasing since the 1980's.

In 1990, the U.S. Fish and Wildlife Service listed the Mojave population of desert tortoise[1] as a threatened species. AR 16851. The listing detailed five factors that contributed to the tortoise's threatened status: destruction and modification of habitat due to vehicle traffic and human uses of the land, collecting and shooting of tortoises, predation by ravens and other animals, disease including respiratory diseases, and inadequate existing regulatory mechanisms to protect the tortoise. AR 16851-16864. The U.S. Fish and Wildlife Service released a Desert Tortoise Recovery Plan in 1994, outlining steps for the

---

[1] The Mojave population is an administrative designation for desert tortoises that live north and west of the Colorado River. AR14753.

recovery of the desert tortoise population: (1) the designation of six geographic "recovery units"; (2) the establishment within each recovery unit of an area of 1,000 square miles as a desert wildlife management area to conserve unique biological characteristics of the tortoises in each recovery unit; and (3) a recommendation to draft a management plan for each recovery unit. AR 14747-15114.

Pursuant to these steps, BLM undertook the planning for two of these recovery units, Northern and Eastern Colorado, in a joint plan entitled the Northern and Eastern Colorado Coordinated Management Plan (the "NECO Plan"), as an amendment to the CDCA Plan, beginning in 1993. The planning process included involvement of private interests, federal, state, and local agencies, and public comment. In February 2001, BLM issued a draft EIS under the strictures of the National Environmental Policy Act ("NEPA") and a public comment period of eight months followed. In July 2002, the final EIS was released and a 30-day protest period was initiated. Finally, on December 19, 2002, BLM issued a Record of Decision for the approved NECO Plan. The approved NECO Plan includes two desert wildlife management areas encompassing 1.7 million acres, and more than 15 wildlife habitat management areas for bighorn sheep and other species.

Plaintiffs initiated the instant action on June 17, 2003, alleging that the preparation of the EIS for the NECO Plan violated NEPA[2]. Specifically, with references to the allegations at issue here, Plaintiffs allege:

(1) BLM failed to analyze the impact of the NECO Plan on disease transmission on desert tortoises;

(2) in the preparation of the EIS, BLM failed to consider all of the available scientific articles and reports pertaining to tortoise disease and its spread;

(3) the EIS failed to analyze or disclose the on-going scientific debate regarding

---

[2] The Complaint also involved other issues which were stayed pending the outcome of these motions. Additionally, two related actions 03cv1079 and 03cv1044 remain stayed pending the outcome of these motions.

1 methods of managing tortoise disease.

2 Plaintiffs and Defendants filed cross–motions for summary judgment on these issues in August 2004 and September 2004, respectively. The hearing on these motions was postponed pursuant to a joint stipulation of the parties to enable them to pursue settlement discussions. After these discussions proved unsatisfactory, the hearings were rescheduled. The parties provided supplementary briefing to summarize their positions and update the Court on any new relevant law. The matter was heard on December 4, 2006.

## II. DISCUSSION

### A. LEGAL STANDARD

Generally, summary judgment is appropriate if the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. of Civ. P. 56(c) (West 2006).

Where a district court reviews an administrative decision, the application of summary judgment is somewhat altered. See Friends of Endangered Species, Inc. v. Jantzen, 589 F.Supp. 113, 117 -118 (N.D. Cal. 1984). The Court reviews the decision under the Administrative Procedures Act ("APA") to ensure it was not "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706. "Thus, unless plaintiff can produce evidence which raises a viable issue as to whether the agency in question . . . acted in an arbitrary and capricious manner (thereby causing a clear error of judgment), [the] defendant['s] motion must be granted." Friends, 589 F.Supp. at 117 -118; see also Akiak Native Community v. U.S. Postal Service, 213 F.3d 1140, 1144 (9th Cir. 2000) (" The 'arbitrary or capricious' standard is appropriate for resolutions of factual disputes implicating substantial agency expertise.").

### B. ANALYSIS

#### 1. Ripeness

As an initial challenge to Plaintiffs' motion, Defendants argue that the issue is not

ripe for judicial review.  Actions that challenge an agency's actions under NEPA are brought under the Administrative Procedure Act ("APA").  Under the APA, to obtain judicial review, a plaintiff must contest a final agency action. The APA includes several categories in the definition of agency action: the whole or a part of an agency rule, order, license, sanction, relief, or the equivalent or denial thereof, or failure to act.  5 U.S.C. § 551(13).  To fall into these categories, an action complained of must be a "circumscribed, discrete agency action[]." Norton v. Southern Utah Wilderness Alliance, 542 U.S. 55, 62 (2004) (hereinafter SUWA).  Additionally, to challenge an agency action, the action must be one that is legally required.  Id. at 63.

Here, Plaintiffs challenge the EIS that supports the NECO Plan and the Record of Decision for the approved NECO Plan.  Under NEPA, "approval of a land use plan is a major Federal action requiring an EIS."  SUWA, 542 U.S. at 73; 43 CFR § 1601.0-6 (West 2006).  Hence, the EIS is a discrete and circumscribed action as well as a legally required one.

Moreover, where the challenge is a procedural challenge under NEPA rather than a substantiative one, the issue becomes ripe for review "when a programmatic EIS allegedly violates NEPA" Laub v. U.S. Dept. Interior, 342 F.3d 1080, 1090 (9th Cir. 2003). Plaintiffs' challenge here is a procedural one; they assert that Defendants did not comply with NEPA requirements in preparing the EIS.  Therefore, this Court finds that Plaintiffs' claims are ripe for review.

### 2. Adequacy of the EIS

The heart of the instant summary judgement motions address whether the EIS supporting the NECO Plan adequately examined the risk of exacerbating the spread of tortoise disease as an impact of the land use plan.  Specifically, Plaintiffs allege that URTD and a shell disease, cutaneous dyskeratosis, are major causes of deaths in the desert tortoise population and yet the administrative record reflects very little information or studies on these diseases.  Plaintiffs contend that the EIS fails to analyze whether the NECO plan

would impact the spread of these diseases and fails to take into account and disclose conflicting views on how to manage these diseases. Defendants respond that the EIS fully complies with NEPA requirements.

### a. Standard for the Court's Review

The Court reviews the adequacy of an EIS under a rule of reason. Kern v. U.S. Bureau of Land Management, 284 F.3d 1062, 1071 (9th Cir. 2000). This does not mean that the Court substitutes its judgment for that of the agency. The agency is given wide discretion to assess the scientific evidence, respond to opposing view points and to rely on reasonable opinions obtained from its own experts. Earth Island Institute v. United States Forest Service, 442 F.3d 1147, 1160 (9th Cir. 2006). The Court's role is to review the administrative record and to determine if the agency has made a reasoned decision based on an evaluation of the evidence consistent with the requirements under NEPA. Id. An analysis under the rule of reason standard is essentially the same as an analysis for an abuse of discretion. Neighbors of Cuddy Mountain v. U.S. Forest Service, 137 F.3d 1372, 1376 (9th Cir. 1998).

NEPA requires an agency to take a "hard look" at the consequences of a proposed action on the environment. Kern, 284 F.3d at 1066. Under NEPA, an EIS must include a detailed statement of "(i) the environmental impact of the proposed action, (ii) any adverse environmental effects which cannot be avoided should the proposal be implemented, (iii) alternatives to the proposed action." 42 U.S.C. § 4332(c). Not every conceivable environmental impact must be examined in an EIS. Ground Zero Center for Non-Violent Action v. U.S. Dept. of Navy, 383 F.3d 1082, 1089 -1090 (9th Cir. 2004). The EIS is only required to include "a reasonably thorough discussion of the significant aspects of the probable environmental consequences." Id.; Kern v. U.S. Bureau of Land Management, 284 F.3d 1062, 1071 (9th Cir. 2000). "An EIS need not discuss remote and highly speculative consequences." Ground Zero, 383 F.3d 1090; Trout Unlimited v. Morton, 509 F.2d 1276, 1283 (9th Cir. 1974). However, an agency cannot avoid addressing an issue by

1  simply saying it is too speculative, because NEPA expects an EIS to include "reasonable
2  forecasting and speculation."  See Kern,  284 F.3d at 1072 ("If it is reasonably possible to
3  analyze the environmental consequences . . . the agency is required to perform that
4  analysis.").  Where there is insufficient information for reasonable forecasting, the agency
5  must make clear that the information is lacking.  40 C.F.R. § 1502.22 (West 2006).

                   **b.     Adequacy of the EIS in Addressing the Spread of Disease Among Desert Tortoises**

8         To assess whether the BLM took the required "hard look" at the consequences of the
9  NECO Plan involves an assessment of which issues qualify as "significant aspects of
10 probable environmental consequences" that should have been examined by the EIS.
11 Plaintiffs argue that the impact of the land set aside as desert wildlife management areas
12 and the designation of travel routes (e.g. limiting off-road access) should have been
13 analyzed as to whether these factors would increase disease transmission among desert
14 tortoise populations.  Defendants contend that insufficient information was available to
15 make this assessment because the methods of spread of the disease were unknown and
16 there was no scientific basis to speculate on how the closure of travel routes might
17 exacerbate disease.

18         The EIS and its supporting administrative record clearly recognize the threatened
19 status of the tortoise; recovery of the desert tortoise species is one of the goals of the
20 BLM's land management plan.  AR 519.  The EIS states that tortoise diseases, particularly
21 URTD and shell diseases, are one of several factors affecting the recovery of the desert
22 tortoise. AR 670.  The EIS identifies diseases as contributing to high tortoise mortality, that
23 "unabated spread would presumably result in large scale declines of 90 percent or more
24 throughout the planning area." AR 760.

25        The EIS also points out where necessary information is lacking.  While it
26 acknowledges that the biological causes of URTD is a known mycoplasm, AR670, the EIS
27 also states that factors contributing to the spread of URTD in the tortoise population are

uncertain. AR 760. With respect to cutaneous dyskeratosis, the EIS notes that neither the biological cause nor the method of spread of this disease between tortoises is known. AR670, 17221. Moreover, the administrative record demonstrates that while the impact of the disease on tortoise health is a known fact, little to nothing is known about the cause and effect relationship of land use design (*e.g.*, the size and design of tortoise corridors and routes for tortoise mobility) and the spread of tortoise disease.[3] Although Plaintiffs argue that BLM failed to consider the available scientific literature, a review of the record suggests no information was available that would have offered any insight into this consideration.[4]

Plaintiffs analogize to <u>Kern v. U.S. Bureau of Land Management</u>, 284 F.3d 1062, 1071, 1072-73 (9th Cir. 2000), to support their argument that the EIS should have examined the impact on tortoise disease spread. This comparison, however, is inapt because <u>Kern</u> sets forth a very different scenario. In that case, the EIS was drafted to analyze the impacts of timber sales on the spread of a tree fungus in the cedar tree populations. <u>Id.</u> at 1067-68. The root fungus was a major if not the only threat to the cedar and its spread was known to be caused by human activities including timber cutting, the proposed activity for which the EIS was drafted. <u>Id.</u> Hence, there was a direct cause and

---

[3] The only apparent mention of this subject appears in a 1994 Desert Tortoise Recovery Plan. AR 14747-15114. This document explains that interpopulation dispersal through linked blocks of tortoise habitat is important for interbreeding and population persistence, acknowledges that a possible negative impact will be the spread of disease, but concludes that advantages of dispersal outweigh its disadvantages and thus interconnected blocks of habitat is the better choice. AR 14811.

[4] Plaintiffs offer over 900 pages of material outside of the administrative record, designated the "supplemental record," for consideration by the Court in its review of adequacy of the EIS. Inclusion of extra-record evidence beyond the administrative record should only be allowed in specific circumstances: "(1) if necessary to determine whether the agency has considered all relevant factors and has explained its decision, (2) when the agency has relied on documents not in the record, . . .(3) when supplementing the record is necessary to explain technical terms or complex subject matter. . . . .[or (4)] when plaintiffs make a showing of agency bad faith. <u>Southwest Center for Biological Diversity v. U.S. Forest Service</u>, 100 F.3d 1443, 1450 (9th Cir. 1996) (internal citations omitted). Having reviewed the proffered supplemental materials, the Court finds that these materials do not meet these criteria. They offer no further information on the critical issue of whether land use plans would impact the spread of tortoise disease. Therefore, they are not considered any further herein.

effect relationship between the proposed action and the disease that could be analyzed by the agency.

Here, in contrast, there is not the same level of information to create a strong cause and effect relationship between proposed activity and its potential impact on tortoise disease. First, unlike <u>Kern</u>, where there was only one major threat to the cedar tree, here tortoise diseases are not the only major cause of tortoise mortality. As detailed in the NECO Plan EIS, a large number of factors directly impact tortoise mortality besides disease: utility corridors in the tortoise habitat (the use of which disturbs food and cover for tortoises), AR 756; the effects of cattle grazing (which includes competition with the tortoise for food and potential trampling issues), AR 756-66; highway traffic and dirt road traffic (impacting run-over of tortoises as well as illegal collection and vandalism of tortoises), AR 758; and predation by ravens on tortoise eggs and young (which increases as human activity in the area increases), AR 759.

Also, unlike <u>Kern</u>, where there was a direct and known link between the disease and the planned timber cutting, here there is no such direct connection. As explained above, whether or not the planned land use regulations would impact disease spread was highly speculative with no scientific information to support any analysis of a cause and effect relationship.[5] In sum, Plaintiffs have offered no explanation as to how the EIS could have reasonably analyzed the potential impact of the land plans on disease spread where practically no information existed on this issue.

Moreover, simply because the EIS more thoroughly analyzed other impacts pertaining to the land use plan, this does not mandate the same level of consideration for

---

[5] Plaintiffs continually argue throughout their briefing that there was a known connection between the diseases and tortoise mortality, but this contention misses the point. What is lacking is a connection between the NECO land use plan, its impact on tortoise mobility and migration and the connection of these factors to a potential exacerbation of disease. Plaintiffs have pointed to no evidence in the record or elsewhere that would establish this connection, nor allow the agency to put forth any reasonable forecasting as to how these factors would impact each other.

every conceivable impact.[6]  An administrative agency need not attempt to regulate everything nor "choose between attacking every aspect of a problem or not attacking the problem at all." Louisiana Ex rel Guste v. Verity, 853 F.2d 322, 332 (5th Cir. 1988); Personal Watercraft Industry Ass'n v. Dept. Commerce, 48 F.3d 540, 544 (D.C. Cir. 1995). NEPA's requirements only demand that an EIS provide "reasonable forecasting and speculation" where it is *possible* to do such analysis. See Kern, 284 F.3d at 1072.

Plaintiffs have also raised the issue that the EIS failed to disclose scientific debate. According to federal regulations, a final EIS must include a discussion of "any responsible opposing view . . . [and] the agency's response to the issues raised." 40 C.F.R. § 1502.9(b). The NECO Plan EIS met this requirement; it includes Appendix S, a compilation of public comments and responses, including those focused on the desert tortoise. AR 1312-1321.

Where there are scientific uncertainties or scientific debate, the EIS also should address these issues. See Seattle Audubon Soc. V. Espy, 998 F.2d 699, 704 (9th Cir 1993); Ecology Center, Inc.v. Austin, 430 F.3d 1057, 1065 (9th Cir. 2005).  Here, the EIS acknowledged that there were uncertainties about tortoise disease causes and spread.  AR 670, 760.  Although Plaintiffs claim that further scientific information was available which conflicted with statements made by the EIS, they fail to make a sufficient showing that such information was relevant and not tangential to the issues at hand.

Thus, Plaintiffs have not produced evidence that raises a viable issue as to whether the agency in question acted in an arbitrary and capricious manner.  The state of the knowledge on tortoise diseases indicates a lack of any scientific information or evidence

---

[6] For example, the EIS examined the effects of surface disturbing projects on habitat fragmentation and vegetation removal and the effects of cattle and burro grazing on competition with the tortoise for grazing vegetation and effects of the animal trampling tortoise burrows. AR895. The EIS also considered effects of fencing highways as a balance between protecting the tortoise from road kills versus the impact on habitat fragmentation and reduced gene flow. Id. Another consideration examined was the effects of prohibiting driving in washes and limiting off-road activities by designating travel routes to reduce road kill, trampling of burrows, habitat degradation and harassment of wildlife. AR896. As reflected in the administrative record, the analysis for each of these impacts was possible because information was available to base a reasonable forecast of how land use would impact each factor.

supporting a connection between the creation of tortoise corridors through land use planning and the potential spread of tortoise disease. As reflected in the administrative record, the agency took the required "hard look" and made a made a reasoned decision based on an evaluation of the evidence consistent with the requirements under NEPA. Therefore, Defendants' motion for summary judgment is **GRANTED**; Plaintiffs' motion for summary judgment is **DENIED**.

### III.  CONCLUSION

For the reasons herein, Defendants' motion for summary judgment is **GRANTED**; Plaintiffs' motion for summary judgment is **DENIED**.

**IT IS SO ORDERED**

DATED:  December 15, 2006

Hon. Rudi M. Brewster
United States Senior District Judge

cc: Hon. Louisa S. Porter
    United States Magistrate Judge

    All Counsel of Record